**2026 UT App 124**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF J.H.L.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

J.H.L.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20241183-CA
Filed August 6, 2026

Second District Juvenile Court, Farmington Department
The Honorable Robert G. Neill
No. 1198819

Colleen K. Coebergh, Attorney for Appellant

Derek E. Brown and Christopher A. Bates,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1　A family fostered a fourteen-year-old boy, JHL. After some disturbing behavior came to light, the placement was terminated, and JHL was returned to the care of the foster agency. About a year later, allegations surfaced that JHL had sexually abused the children in the foster family. A petition was subsequently filed in juvenile court, alleging sodomy, sexual abuse, and lewdness. At trial, JHL testified in his own defense. He now complains that the court did not adequately advise him about the danger of self-incrimination as required by the Utah Rules of Juvenile

Procedure. We see no error in the juvenile court's challenged actions and therefore affirm its disposition of the case.

## BACKGROUND

### *The Sexual Abuse*

¶2      Beginning in May 2021, Michael and Nicole were foster parents to JHL, who was fourteen years old at the time.[1] They had five other children in their home, including John (age ten), Ariel (age six), and Abilene (age four).

¶3      John shared a bunk bed in the same bedroom as JHL, with John sleeping on the top and JHL sleeping on the bottom. John stated that JHL would sometimes hide under a blanket and cause the bed to shake. When John asked JHL what he was doing, JHL responded that he "was masturbating." Specifically, John explained that JHL moved the blanket and showed him his penis as he was grabbing it and rubbing it. John demonstrated what he saw by making an up-and-down motion with his hand. John said that he masturbated too at JHL's suggestion.

¶4      John also described a "vampire game" in which he and JHL would chase each other around and pretend to bite one another's shoulders. JHL started sucking on John's neck during the game, prompting John to tell him to stop.

¶5      JHL also used his cell phone to show John pornographic photos and videos of people having sex. And he showed John videos of people talking about pills that made their "private[s]" bigger. John later told his parents about the pornography, but he

---

1. We use the same pseudonyms for JHL's foster parents and foster siblings that were employed by the State in its briefing.

did not tell them about the masturbation incident because JHL had "threatened to hurt" him.

¶6    Ariel and Abilene also complained of inappropriate behavior from JHL. Specifically, Ariel said that, when JHL was in the living room with the two sisters, JHL pulled down her pants and put his penis "in [her] bum." She said he also put his penis in her mouth and moved it "up and down." Ariel said that JHL did the same thing to Abilene. Ariel specified that this abuse happened more than one time to both her and Abilene. Abilene revealed that JHL also touched her "privates" with his hands. Ariel and Abilene didn't tell their parents about what had happened at the time.

¶7    After about six weeks of JHL staying with them, Michael and Nicole became concerned about JHL's interactions with John related to the "vampire game." They were also troubled by "some issues with pornography" because JHL was "looking at pornography any time he got an [electronic] device" and John was being exposed to pornography. They told the foster agency about JHL's behavior, leading to the termination of his placement in their home.

¶8    About a year later, Ariel told Nicole that JHL had "done bad things" to her and Abilene, and Nicole shared this information with Michael. This led to the involvement of law enforcement and Children's Justice Center (CJC) interviews of John, Ariel, and Abilene.

*The Proceedings*

¶9    The State filed a petition against JHL setting forth three allegations of sodomy on a child and one allegation each of sexual abuse of a child and lewdness involving a child. The State arraigned JHL on these allegations. While there is no transcript of the arraignment in the record, the minute entry states that "[a]ll

rights [were] explained" to JHL, "including the right to trial, the right to have the state meet its burden of proof beyond a reasonable doubt, the right to confront the state's witnesses, the right to have witnesses compelled to appear, the right to appeal, and the right to remain silent."

¶10    At trial, the State's witnesses included Michael, Nicole, John, and Ariel, who testified to the facts described above. The State also introduced recordings of the CJC interviews. Additionally, the CJC interviewer testified, explaining that it is common for children's courtroom testimony to differ somewhat from what they reported during a CJC interview due to the amount of time between those events or because the courtroom environment is frightening. Furthermore, the interviewer noted that children frequently have a hard time remembering the exact number of times something took place.

¶11    After the State rested, JHL took the witness stand. Before he did so, JHL's lawyer (Counsel) stated, "I have gone over my client's constitutional rights against self-incrimination a number of times with him." Counsel also averred that he had spoken to JHL's guardian ad litem, who had "no objection to him waiving" his constitutional right against self-incrimination. Counsel nonetheless reiterated, "I want to just put on the record that I explained to [JHL] that he does not have to testify, that it's the state's burden of proof, that if he testifies, he's waiving that right against self-incrimination. And he would be subjecting himself to answering questions by me and by the prosecutor and would be under obligation to answer those questions." Counsel concluded by saying, "And he has said to me every time that this is the way that he would like to proceed, even understanding that he does not have to testify."

¶12    Once on the stand, JHL denied all allegations of inappropriate behavior, including exposing himself to John, showing him pornography, and inappropriately touching Ariel

and Abilene. During his testimony, he offered alternative explanations for several of the accusations. As for the bed shaking, he claimed that it was caused by the family's dogs jumping on the bottom bunk. However, his description of the dogs was contradictory; he initially called them "little dogs" but later stated they were larger. He denied showing John pornography, stating that he showed him only a video of a couple kissing on the beach in their swimsuits. He also claimed that a video John thought was about enlarging private parts was actually about taking steroids for muscle growth. JHL did admit to viewing pornography in private on one occasion, which he had discussed with Michael and Nicole. He acknowledged playing a "vampire game" with John but insisted the game was John's idea. He denied biting John's neck, describing his actions as "just kind of a little sucking" and claiming that the specific incident during the game that concerned Michael and Nicole was merely an accident.

¶13 JHL expressly denied any inappropriate contact with Ariel or Abilene, asserting that he treated them like his own sisters and that the girls were almost never left alone. He also accused Ariel of being dishonest in the past, citing an incident where she ruined a dress but blamed it on her younger sister.

¶14 At the conclusion of the trial, the juvenile court determined that the State successfully proved the allegations of sodomy on a child and sexual abuse of a child beyond a reasonable doubt, relying on the testimony and interview statements provided by the children. The allegation of lewdness involving a child was dismissed because the statute of limitations had expired.

¶15 The court deemed the children to be credible witnesses. Specifically, the court noted that they lacked any motive to lie, used age-appropriate language, and showed no signs of having been coached. Furthermore, their accounts were corroborated by other evidence: Ariel and Abilene gave matching descriptions of

the abuse during separate interviews, and Michael's testimony regarding JHL's frequent use of pornography backed up John's claim that JHL had shown him inappropriate material. The court reasoned that while some minor details may have faded from the children's memories due to their young ages and due to the time that had passed since the abuse, the core facts of the abuse remained consistent.

¶16  In contrast, the court found JHL to be an unreliable witness. The judge characterized his testimony as full of "half truths" and "quarter truths" designed to excuse his own behavior by rebutting the children's allegations. Specifically, the court noted that JHL's denial of his pornography use was directly contradicted by Michael's testimony, and the court outright rejected his alternative explanations for specific incidents—such as blaming a shaking bunk bed on dogs or claiming he showed John a video about muscle-building steroids—as "incredible."

¶17  In addition to ordering JHL to complete a sexual behavior risk assessment, the court ordered him to have no unsupervised contact with any child under fourteen years old and no unsupervised access to the internet. The court later placed JHL on formal probation, ordered him to complete community service, and ordered him to have no contact with the victims or their family.

ISSUE AND STANDARD OF REVIEW

¶18  JHL appeals, arguing that the juvenile court plainly erred when it did not expressly advise him that anything he testified about at trial could be used against him. "Because a claim of plain error . . . involves no lower court ruling, we decide the claim in

the first instance as a matter of law." *State v. Dew*, 2025 UT App 22, ¶ 28, 566 P.3d 53, *cert. denied*, 568 P.3d 264 (Utah 2025).[2]

ANALYSIS

¶19  JHL argues that he was "inadequately advised by the Juvenile Court of his right against compulsory self-incrimination." Because he "was not told that if he testified, not

---

2. JHL also argues that exceptional circumstances justify reaching the same unpreserved issue. "The exceptional circumstances doctrine allows this court to reach an unpreserved issue in cases involving rare procedural anomalies. We apply the exception sparingly, reserving it for the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would result in manifest injustice." *State v. Munguia*, 2011 UT 5, ¶ 11, 253 P.3d 1082 (cleaned up). JHL does not identify "any rare procedural anomaly or other exceptional circumstance that might justify his failure to preserve" this issue. *See State v. Guzman*, 2018 UT App 93, ¶ 48 n.12, 427 P.3d 401; *see also Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 21 n.3, 507 P.3d 357 ("Because [the plaintiff] has not demonstrated that a rare procedural anomaly prevented or excused him from raising this argument before the district court, he has not shown that exceptional circumstances overcome our preservation rule."). He simply asserts that the alleged "incomplete advisement regarding [his] right against compulsory self-incrimination resulted in an uninformed, and therefore unknowing and involuntary 'choice' . . . to testify." But a "rare procedural anomaly" does not directly concern the alleged error itself; rather, it concerns some defective procedural circumstance that prevented a claimed error from being raised before the juvenile court and thereby preserved for appeal. That's not what happened here, and JHL makes no assertion to the contrary. "Accordingly, we decline to address this argument further." *Guzman*, 2018 UT App 93, ¶ 48 n.12.

only would the prosecutor cross-examine him, but that anything he said would be used against him," JHL argues that "his decision to testify cannot be deemed knowing or voluntary." Thus, he argues that the juvenile court ran afoul of rule 26 of the Utah Rules of Juvenile Procedure and the constitutional principles underlying it. *See* Utah R. Juv. P. 26(a)(7) ("A minor who is the subject of a delinquency petition . . . shall be advised of the [right] . . . to remain silent and to be advised that anything the minor says can and will be used against the minor in any court proceedings . . . ."). Due to this alleged error, JHL asks that we reverse his adjudications and remand this matter for a new trial. JHL recognizes that he did not preserve this issue for appellate review and therefore asks us to review it for plain error. We reject this claim because JHL has failed to show that an error occurred.

¶20    "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful. If any one of these requirements is not met, plain error is not established." *State v. Cissel*, 2024 UT App 139, ¶ 18, 558 P.3d 911 (cleaned up), *cert. denied*, 564 P.3d 956 (Utah 2025). "For an error to be obvious to the trial court, the law governing the error must be clear or plainly settled." *State v. Van Huizen*, 2019 UT 1, ¶ 30, 435 P.3d 202 (cleaned up). The law is clear or plainly settled when, for example, there is a Utah case addressing the "specific factual scenario" at issue or the plain language of the applicable statute or rule makes clear that there was error. *See id.* ¶¶ 31–32. Stated differently, "an error is obvious if from a review of the record, the appellate court is led to the conclusion that given the circumstances, the trial court should have been aware that an error was being committed at the time." *State v. Marquina*, 2020 UT 66, ¶ 30, 478 P.3d 37 (cleaned up). JHL's claim of error falls short for two reasons, which we address in turn.

A.     Inadequate Record

¶21     The first problem with JHL's claim of plain error is that the record he supplied is inadequate to show that the claimed error took place at all. "A party bringing a claim of error before this court has the duty and responsibility to support such allegation by an adequate record. When an appellant fails to provide an adequate record on appeal, this court presumes the regularity of the proceedings below." *State v. Case*, 2020 UT App 81, ¶ 19, 467 P.3d 893 (cleaned up). It naturally flows from this point that "when crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." *State v. Chettero*, 2013 UT 9, ¶ 32, 297 P.3d 582 (cleaned up); *see also Turner v. Nelson*, 872 P.2d 1021, 1024 (Utah 1994) ("In the absence of a complete record we assume that the proceedings at trial were regular and proper." (cleaned up)).

¶22     Such is the case here. The record indicates that the juvenile court held no fewer than fourteen hearings in this case. But JHL has provided transcripts from only two of these fourteen hearings—the trial and the disposition hearing. Notably, he has not provided the transcript for the arraignment hearing, the minute entry for which clearly states that all of JHL's rights were explained to him, "including the right to trial, the right to have the state meet its burden of proof beyond a reasonable doubt, the right to confront the state's witnesses, the right to have witnesses compelled to appear, the right to appeal, and the right to remain silent." Nor has he provided the transcript for another preliminary hearing that took place about six months later, the minute entry for which states that the juvenile court informed "the parties [of] the importance of [JHL] being allowed ample opportunity to speak with [Counsel] and [his] guardian ad litem so he [would be] able to understand his rights and the matters" before the court.

¶23    In the absence of a complete record of what the juvenile court told JHL—particularly regarding what was communicated at the two proceedings noted above—"we presume the regularity of the proceedings below," *see State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278, including that the juvenile court did what the minutes say it did in apprising JHL of all of his rights.

¶24    Given the lack of an adequate record that shows anything to the contrary, JHL's claim of plain error fails at the threshold. There is simply nothing in the record to suggest that the court failed to warn him that anything he said could be used against him.

B.    No Obvious Error

¶25    The second fault in JHL's claim is that he has not shown the juvenile court was required to warn him that his trial testimony could be used against him, especially in light of the statement made by Counsel that he had explained to JHL that he would be waiving his right against self-incrimination if he elected to testify.

¶26    Rule 26 states that a "minor who is the subject of a delinquency petition. . . *shall be advised* of the [right] . . . to remain silent and to be advised that anything the minor says can and will be used against the minor in any court proceedings." Utah R. Juv. P. 26(a)(7) (emphasis added). This provision is phrased in the passive voice; the rule does not specify which person or entity is to do the advising. In particular, nothing in the rule states that this warning must come from the juvenile court. As noted, the trial transcript clearly indicates that Counsel explained to JHL his right against self-incrimination and his right not to testify. Counsel also explained to JHL that he would be required to answer some difficult questions from both him and the prosecutor if he chose to testify.

¶27 Given these assertions from Counsel, two things would have been clear to the juvenile court. First, by Counsel's telling JHL that he would have to answer some tough questions if he testified, the juvenile court would have concluded that JHL knew that his answers could potentially hurt his defense. In other words, telling JHL about his obligation to answer questions from Counsel and the prosecutor may well have sufficed to warn him that his testimony could be used against him. In no way would it have been obvious to the juvenile court that a more fulsome warning was needed.

¶28 Second, there is nothing in rule 26 that would have indicated to the juvenile court that more needed to be done to advise JHL of his rights. Counsel said that he had explained JHL's rights to him. And there is every reason to believe that the juvenile court would have reasonably concluded that this explanation included an admonition that JHL's testimony could be used against him. Moreover, we know from the limited record that "[a]ll rights" were explained to JHL at the time of his arraignment. And nothing in the plain text of rule 26 requires that a warning given at one point during the proceedings must be repeated later in the proceedings, for example, when a minor testifies at trial, as happened here. *See id.* Under the presumption of regularity, *see Case*, 2020 UT App 81, ¶ 19, JHL had already received the warning at his arraignment. The juvenile court knew this had happened and would have had no reason to revisit the issue prior to JHL's testimony at trial.

¶29 Because JHL identifies no error—much less an obvious one—in how the juvenile court addressed his decision to testify at trial, this claim necessarily fails.[3]

---

3. JHL's complaint of plain error also falls short on prejudice grounds. *See State v. Thompson*, 2025 UT App 185, ¶ 19, 583 P.3d

(continued…)

CONCLUSION

¶30 JHL's claim of plain error fails for two compelling reasons. He has neglected to provide an adequate record of the proceedings, including a transcript of a hearing in which he was advised of his rights. And the plain text of rule 26 imposes no duty on the juvenile court to undertake the admonition prior to a minor offering trial testimony, especially where the minor's attorney assures the court that the attorney has already explained to the minor what the minor's rights are.

¶31 Affirmed.

_____

1095 (stating that failing to demonstrate prejudice proves fatal to a plain error claim). Even if JHL had chosen not to testify after receiving a perfectly worded rule 26 warning from the court at trial, he would have still been adjudicated delinquent. The children's testimony—at trial and through the CJC interviews—was deemed credible and corroborated by the court, a determination that did not depend on JHL's testimony. In other words, the credibility of their testimony did not rest in any way on JHL's testimony. Therefore, the court did not rely on JHL's testimony to reach the conclusion that the State had proved the allegations of sodomy and sexual abuse beyond a reasonable doubt. That determination was moored in the children's testimony, with JHL's testimony being a non-factor. The juvenile court's finding that JHL was not credible was not a reason it found the children's testimony credible. The children's testimony was credible in its own right, independent of JHL's testimony. Simply put, because JHL cannot show his testimony affected the outcome, his claim of plain error also fails on prejudice grounds.